In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3940

Samer Mansour,

Petitioner,

v.

Immigration and Naturalization
Service,

Respondent.

On Petition for Review
from the Board of Immigration Appeals
No. A7 422 108

Argued September 13, 2000--Decided October 16, 2000

Before Flaum, Chief Judge, and Bauer and Kanne,
Circuit Judges.

Flaum, Chief Judge.  The Immigration Court denied
Samer Mansour's claim for asylum as well as
withholding of removal, but granted him voluntary
departure. Mansour then appealed the Immigration
Court's decision and filed a motion to remand or
reopen the proceedings. The Board of Immigration
Appeals ("BIA") affirmed the Immigration Court's
decision concerning Mansour's asylum and
withholding of removal request and dismissed his
appeal. The BIA also denied Mansour's motion to
remand. For the reasons stated below, we affirm
in part and remand in part.

Background

Mansour is an unmarried 42-year-old native and
citizen of northern Iraq. He entered the United
States on June 12, 1996 as a non-immigrant
fiancee of a United States citizen and was
authorized to remain in the United States until
September 12, 1996. Because Mansour never married
the person that sponsored his visa, he did not
qualify for permanent resident status. Having
remained in the United States beyond the time he
was authorized to do so, on November 12, 1997,
Mansour filed a request with the Immigration and
Naturalization Service ("INS") for asylum. His
application for asylum included a statement and

a number of supporting documents. On December 22, 1997, a Notice to Appear was issued charging Mansour with removability under sec. 237(a)(1)(B) of the Immigration and Nationality Act. At a hearing held on March 4, 1998, Mansour admitted the allegations contained in the Notice to Appear, conceded removability, and indicated his desire to apply for asylum and withholding of removal.

Mansour and his brother testified at his final hearing before the Immigration Judge ("IJ") on April 17, 1998 to support Mansour's claim that he feared returning to Iraq. During his testimony, Mansour chronicled the events that led to his arrival in the United States. He had served in the Iraqi army from October 1980 through 1989. Before joining the army in 1980, Mansour was a student at the Petroleum Institute. Unlike his classmates who were allowed to perform their military service while continuing their studies at the Petroleum Institute, Mansour claimed he had to serve in the Iran-Iraq war because his brother had left Iraq for the United States. While serving in the war, his left leg was injured in 1983. After his sick leave period, Mansour stated that he did not return to the army, but instead he chose to return to his village. Three months after injuring his leg Mansour returned to the army. He related that he did so because he received news that his father was "being bothered by the security." Mansour claimed that he was not well treated when he returned to the army and he was harassed because he is an Assyrian Christian and because his brother left Iraq for the United States. According to Mansour, he was punished upon his return to the army in 1983. His leg was broken and he was punched in the eye, resulting in poor vision. Mansour attributes the beating to the army's perception that "they thought that I had joined the Kurdish rebels."

After he finished his army service in 1989, Mansour obtained work at the oil refinery by paying a bribe to someone. This job only lasted for two months. He was fired because security forces sent reports about how he was not a "decent Iraqi citizen." At this point, Mansour decided that he wanted to leave Iraq because of the "pressure and inconvenience that [he] was getting in Iraq and difficulties in finding a job." Leaving Iraq during this period proved difficult because of the impending Gulf War. While trying to obtain a passport and waiting for his brother to send him money, he was drafted into the Iraqi army. His unit was heavily bombarded by the Allied Forces and at one point they considered surrendering to the Allied Forces, but did not. Instead, his unit deserted

and returned to Iraq. He then went into "hiding" at his uncle's house in Baghdad. In 1992, Mansour took his parents and younger brother to Jordan. While testifying he denied being beaten, arrested, or imprisoned upon returning to Iraq in 1992, even though the statement attached to his application for asylum and withholding of removal recounted such an event. Mansour stated that his decision to return to Iraq resulted from commitments he had to other family members in Iraq. From 1992 until 1995, Mansour worked as a taxi driver and he was able to cross between Iraq and Jordan several times by bribing people working at the borders. Although Mansour acknowledged that after the Gulf War the Iraqi government pardoned all soldiers who deserted the military and all those who failed to serve, he claimed that he did not trust the government to honor its policy of pardoning deserters. Eventually, Mansour bribed friends in order to obtain a passport and visa for Turkey. While in Turkey, he met an American woman to whom he became engaged and he entered the United States with her.

After the final hearing, the IJ denied Mansour's application for asylum and alternative request for withholding of removal. The IJ granted Mansour's request that he be allowed to voluntarily depart the United States. An inconsistency in Mansour's testimony and statement attached to his application for asylum and withholding of removal led the IJ to conclude that Mansour's request should be denied on the basis of a lack of credibility. The IJ determined that Mansour had provided false information in the statement that he presented to the court. He claimed in his statement that after taking his parents to Jordan in 1992 that the Amen (Iraqi secret police) arrested him, sent him to prison, and tortured him. During his hearing, however, he denied that this incident ever occurred. Mansour managed to leave and return to Iraq numerous times after the Gulf War without being arrested, detained, or punished because of his supposed desertion from the Iraqi army. According to the IJ, if Mansour truly feared that the government would harm him, "he would have remained outside of Iraq at all costs under the circumstances of his case." Both "because the respondent presented false information in his request for asylum and because he repeatedly returned to Iraq despite his 'alleged fear' that he could be harmed," the IJ found his case not to be credible.

On May 15, 1998, Mansour filed a notice of appeal to the BIA. On June 18, 1999, he also filed a "Motion to Remand/Reopen Proceedings based upon Convention Against Torture Provision" with the BIA. The BIA responded by affirming the

IJ's decision on October 18, 1999, thereby dismissing Mansour's appeal and denying his motion to remand.

Analysis

A. Asylum/Withholding of Removal Claim

We review the BIA's decision to deny Mansour either asylum or withholding of removal under the "highly deferential version of the substantial evidence test." Karapetian v. INS, 162 F.3d 933, 936 (7th Cir. 1998). This deferential standard of review requires us to affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole," INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992), and reverse when the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Id. at 484.

The IJ found that Mansour's presentation of false information caused him to lack credibility and the BIA agreed that Mansour had not presented a credible claim. Mansour attempted to attribute the discrepancy between his written statement attached to his application for asylum and his hearing testimony as resulting from a mere confusion of dates. This explanation did not satisfy the BIA. His statement described a 1983 incident where the military authorities during the Iraq-Iran war broke his leg and a 1992 encounter which allegedly occurred when Mansour returned from Jordan, when supposedly the Amen sent him to a secret prison in Baghdad where he was then beaten repeatedly. Before the IJ, Mansour denied that this latter event ever happened. Mansour described these incidents, according to the BIA, "as distinctly separate and different incidents" and the assertion that there was a mere mistake in dates did "not make sense." This inconsistency is significant because Mansour said that although he traveled frequently between Jordan and Iraq, he feared being punished for deserting the Iraqi army. If Mansour actually was detained and beaten upon returning from Jordan, this would have bolstered his claim that he feared retribution for desertion. According to the BIA, the discrepancy between Mansour's testimony and written statement was "significant" and therefore the IJ's adverse credibility finding was appropriate considering that it was "based on inconsistent statements which were central to the respondent's claim."

At oral argument, Mansour's lawyer argued that Mansour or someone in his former attorney's office had made a mistake concerning the date of his beating and that he was not trying to manufacture a claim. Also, he argued, his

attorney at the time was not conversant in Mansour's language and Mansour did not speak English. Mansour contends that he traveled back and forth from Jordan to Iraq because of family obligations. In addition, Mansour claims that his attorney told the IJ that Mansour's testimony in the Immigration Court was consistent with his earlier asylum interview./1

   The BIA reached a reasonable conclusion based upon the facts presented to them. "We are simply not in a position to second-guess those kinds of factual findings and credibility determinations." Karapetian, 162 F.3d at 937. In Ahmad v. INS, 163 F.3d 457, 461 (7th Cir. 1999) we outlined the great deference that we accord credibility determinations,

Credibility determinations are accorded substantial deference, but they must be supported by "specific, cogent reasons." In addition, these reasons must "bear a legitimate nexus to the finding." Credibility determinations in these sorts of proceedings should only be overturned under extraordinary circumstances, and a reviewing court should not supersede an administrative agency's findings simply because an alternative finding could also be supported by substantial evidence (internal citations omitted).

   This case does not present any extraordinary circumstances. The BIA's decision provides "cogent reasons" for upholding the IJ's adverse credibility determination. Ahmad, 163 F.3d at 461. Mansour failed to provide any convincing reasons for the inconsistency between his written statement and his testimony before the IJ. Without a concrete explanation other than the language difficulty for the discrepancy, we are given no other choice than to accept the BIA's adverse credibility determination and that his repeated returns to Iraq undermine his alleged fear of persecution. We cannot characterize the BIA's decision, which relies upon the IJ's opinion, as failing to meet the highly deferential substantial evidence test.

   We therefore conclude that Mansour has not met his burden of showing that the BIA's decision to affirm the IJ lacked a sufficient evidentiary foundation.

B.   The Convention Against Torture Claim

   We review the BIA's decision not to reopen the case under the Convention Against Torture for abuse of discretion./2 INS v. Doherty, 502 U.S 314, 323 (1992); Guan v. INS, 49 F.3d 1259, 1261 (7th Cir. 1995). The BIA's decision to deny Mansour's motion to reopen will be upheld "unless

it was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." Wijeratne v. INS, 961 F.2d 1344, 1348 (7th Cir. 1992) (quoting Achacoso-Sanchez v. INS, 799 F.2d 1260, 1265 (7th Cir. 1985) (internal quotation marks omitted)).

The BIA can deny a motion to reopen on any of the following three independent grounds: (1) "failure to establish a prima facie case for the relief sought;" (2) "failure to introduce previously unavailable, material evidence;" and (3) "a determination that even if these requirements were satisfied, the movant would not be entitled to the discretionary grant of relief which he sought." Doherty, 502 U.S. at 323.

The BIA refused Mansour's motion to reopen his case on the ground that he failed to establish a prima facie case for protection under the Convention Against Torture. See United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, sec. 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (Pub.L. 105-277, 112 Stat. 2681, 2681-821). An applicant has the burden of proof to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. 8 C.F.R. sec. 208.16(c)(2) (1999). The Convention Against Torture provides that if credible, an applicant's testimony may be sufficient to sustain the burden of proof without corroboration. Id. Because the BIA agreed with the IJ that Mansour's testimony was not credible, the BIA found that he had "not met his burden of proof to demonstrate that it is more likely than not he would be tortured if removed to Iraq." Accordingly, the BIA denied his motion to remand his case to the IJ.

The government argues that the BIA appropriately took into consideration the adverse credibility determination when considering Mansour's Convention Against Torture claim. See Matter of S-V-, Interim Dec. 3430 (BIA 2000) ("[W]e have reopened proceedings 'where the new facts alleged, when coupled with the facts already of record, satisfy us that it would be worthwhile to develop the issues further at a plenary hearing on reopening.'") (quoting Matter of Sipus, 14 I. & N. Dec. 229 (BIA 1972)). Mansour's claim for asylum and his claim under the Convention Against Torture, according to the INS, center around the same evidence--that is, evidence regarding Mansour's status as an Assyrian Christian.

Mansour argues that his asylum claim and motion

to reopen under the Convention Against Torture are two separate forms of relief. Accordingly, each claim deserves individualized consideration. We cannot conclude that the BIA conducted a complete review of Mansour's claim as evidenced by: (1) its use of the phrase "Syrian Christians" in its opinion and not "Assyrian Christians," when Mansour labeled himself as an Assyrian Christian both in his appeal and motion to reopen; and (2) its silence with regard to the U.S. Department of State's Report (1998) that suggests that the Iraqi government has engaged in abuses against the Assyrian Christians, a minority, who are living in Iraq. The latter source of information may well be an indication of gross, flagrant, or mass violations of human rights in Iraq;/3 however, the BIA never addressed this evidence.

We are reluctant to dislodge determinations made by the BIA because generally we respect and defer to their expertise in the area of immigration law. Karapetian, 162 F.3d at 934; Sanon v. INS, 52 F.3d 648, 651 (7th Cir. 1995). Immigration cases can present both complex issues and factually sensitive situations. Sanon, 52 F.3d at 651. Therefore, we are hesitant to criticize BIA decisions for minor matters. Furthermore, the BIA is not required to "write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." Becerra-Jimenez v. INS, 829 F.2d 996, 1000 (10th Cir. 1987).

What is troubling about this case is the BIA's reference to Mansour and his family as "Syrian Christians" in its opinion. While Assyrians are non-Arab people--that is, they are Christians-- Syrians are largely Muslim people. The BIA's mistake is potentially critical. Mansour's Convention Against Torture claim centers upon his ethnic/religious affiliation as an Assyrian Christian. To label Mansour as a "Syrian Christian" leads us to question whether the BIA adequately comprehended and addressed Mansour's torture claim. See Chitay-Pirir v. INS, 169 F.3d 1079, 1081 (7th Cir. 1999) ("[I]t is impossible to be confident that Chitay-Pirir's claim has been fully understood or analyzed.").

While we do not reverse the BIA's determination concerning Mansour's application for asylum and withholding of removal, that does not preclude us from further assessing the BIA's analysis of Mansour's torture claim. In this particular situation, the BIA's adverse credibility determination in the asylum context seems to overshadow its analysis of Mansour's torture claim. The BIA in a minimalistic and non-detailed

manner addressed Mansour's torture claim; leaving us to ponder whether the BIA sufficiently focused on this claim or merely concluded it was not viable because of its determination that Mansour's prior testimony on the asylum issue was not credible.

We are not comfortable with allowing a negative credibility determination in the asylum context to wash over the torture claim; especially when the prior adverse credibility determination is not necessarily significant in this situation. What is critical is to consider Mansour's torture claim based upon his ethnic/religious affiliation separate and apart from his earlier asylum claim. Mansour is not a citizen of Syria, as the phrase "Syrian Christian" may suggest. He is an Iraqi national, an ethnic Assyrian, and a member of the Chaldean Catholic Church. The U.S. Department of State's Report (1998), which is not discussed by the BIA, states that "Assyrians are an ethnic group as well as a Christian community" and that the Iraqi government "has engaged in various abuses against the country's 350,000 Assyrian Christians." See U.S. Department of State, Country Reports on Human Rights Practices for 1998--Volume II, at 1682, 1686. The Report also indicates that there is "continued systemic discrimination" against Assyrians that involves forced movement from northern areas and repression of political rights in those areas of Iraq as well. Id. at 1686. The Report is specific on the meaning and consequence of being part of the ethnic/religious group of Assyrian Christians and had the BIA addressed the Report it might have viewed Mansour's torture claim differently.

Mansour's contentions regarding the BIA's review of his Convention Against Torture claim force us to conclude that we cannot accept the determination of the BIA on this issue. See, e.g., Chitay-Pirir, 169 F.3d at 1081; Stankovic v. INS, 94 F.3d 1117, 1120 (7th Cir. 1996); Hengan v. INS, 79 F.3d 60, 63-64 (7th. Cir. 1996); Salameda v. INS, 70 F.3d 447, 449, 451 (7th Cir. 1995); Bastanipour v. INS, 980 F.2d 1129, 1133 (7th Cir. 1992). Mansour's ethnic/religious affiliation as an Assyrian Christian was the primary basis for his Convention Against Torture claim. In contrast, Mansour did not center his asylum claim around his ethnic/religious background. His two claims differ enough in nature that each warrants individualized treatment. Therefore, we cannot defer to the BIA's decision when we are not confident that the basis of Mansour's torture claim was thoroughly explored. The BIA's mislabeling of Mansour's ethnic/religious affiliation and its limited discussion of his torture claim precludes us from determining

whether the BIA reached an appropriate conclusion.

The error in the BIA opinion cannot be viewed as inconsequential because the label of Assyrian Christian carries with it a host of possible repercussions if Mansour were to return to Iraq. Nonetheless, we are not convinced that Mansour has adequately stated a Convention Against Torture claim that would warrant reversal of the BIA's decision on his motion to reopen. See Sanon, 52 F.3d at 652 ("Where an agency has failed to comply with its responsibilities, we should insist on its compliance rather than attempt to supplement its efforts."). We are convinced, however, that the BIA did not adequately consider Mansour's torture claim based on his ethnic/religious affiliation as an Assyrian Christian.

For the foregoing reasons, we Affirm the BIA's decision regarding Mansour's request for asylum and withholding of removal. We Vacate the BIA's decision concerning Mansour's Convention Against Torture claim and Remand for further proceedings consistent with this opinion.

/1 The INS points out that the allegation that Mansour's former attorney told the IJ that he said the same thing at his hearing as he did in his earlier asylum interview is not supported by the record. In the record itself, Mansour's former attorney does ask about "notes from the asylum interview," but the inquiry ends there. Even if we were to presume that Mansour's hearing testimony was consistent with his initial asylum interview, this would still not explain why his statement attached to his application for asylum included false information.

/2 Although Mansour titled his appeal as both a motion to remand/reopen, the BIA determined that Mansour's request was "essentially a motion to reopen proceedings to present additional evidence and apply for new relief." We therefore will analyze his request as a motion to reopen and apply the abuse of discretion standard of review.

/3 8 C.F.R. sec. 208.16(c)(3) (1999) provides:

(3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:

(i) Evidence of past torture

inflicted upon the applicant;

(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

(iv) Other relevant information regarding conditions in the country of removal.