**Farah Mudathir Farah TAHA, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–73499.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 2003.

Filed March 31, 2004.

Land Wayland, City of Industry, CA;
Sam H. Hasan, Hasan Law Group, Falls
Church, VA, for the petitioner.

John D. Williams; Julia K. Doig, Office
of Immigration Litigation, U.S. Depart-
ment of Justice, Civil Division, Washing-
ton, DC, for the respondent.

Before: BEEZER and KOZINSKI,
Circuit Judges, and SCHWARZER,* 
Senior District Judge.

SCHWARZER, Senior District Judge:

Farah Mudathir Farah Taha ("Taha")
petitions for review of a Board of Immi-
gration Appeals ("BIA" or "Board") deci-
sion denying his applications for asylum,
withholding of removal, and relief under
Article 3 of the Convention Against Tor-
ture ("Convention").[1] Taha argues that no
substantial evidence supports the BIA's
denial of asylum and withholding of remov-
al, that the BIA and immigration judge
("IJ") violated his due process rights, and
that the BIA erred by failing to indepen-
dently evaluate his claim under the Con-
vention. We have jurisdiction under 8
U.S.C. § 1252 and we deny the petition for
review.

## FACTUAL AND PROCEDURAL HISTORY

Taha, a native and citizen of Sudan,
applied for asylum and withholding of re-
moval in December 1999. In support of
his application, Taha submitted a seven-
page, typewritten declaration describing
himself as a member of the Umma Party
and an active opponent of a series of mili-
tary dictatorships in Sudan. Taha de-
clared that government officials fired him
from the Department of Transportation in
November 1991 for opposing the regime,
and unfairly arrested him in January 1994
for similar reasons. Taha did not aver
that government agents ever physically

---

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

1. United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, as implemented by Pub.L. No. 105–277, § 2242, 112 Stat. 2681, 2681–821, *see* 8 C.F.R. 208.17 (2003).

harmed him, however, and stated that he was released after his January 1994 arrest upon requesting legal counsel.

Taha told a vastly different story in his testimony before the immigration court. He alleged for the first time that he was beaten by government police officers in March 1983 and was detained in 1985 and made to sign certain confessions. Taha additionally recounted an extreme act of persecution that took place in 1989, in which government agents allegedly forced him to sit on a small Coke or Pepsi bottle after he refused to sign incriminating statements. Taha testified that he was forced to sit on the bottle for seven hours, until he bled profusely, and that he later required corrective bowel surgery in Saudi Arabia.

Taha also testified to a far more dramatic and violent version of the 1994 incident than his application had alleged. Taha claimed that government agents seized him from his place of business, beat, handcuffed, and blindfolded him, and threatened to throw him to the bottom of a well. Taha stated that the agents then took him to a "ghost room," or torture room, where they demanded that he sign another confession. When he at first refused, Taha was allegedly forced to walk through broken glass, beaten, stabbed with a bayonet through his leg and left wrist, and made to sit on broken glass until he lost consciousness, waking up the next morning on the street. None of these details appear in Taha's declaration.

The IJ denied Taha's application for asylum and withholding of removal, as well as his oral request for relief under the Convention. The IJ found Taha incredible based on his confusing and misleading testimony, failure to specify whether the persecution to which he testified had happened to him or to other people, and failure "to allege important events in his dec-laration that he alleged in his testimony." On appeal, the BIA concluded that Taha "hampered" his credibility by failing to explain or resolve several substantial discrepancies between his testimony and declaration. As a result, the BIA held that Taha had not met his burden of demonstrating eligibility for asylum, withholding of removal, or relief pursuant to the Convention.

## DISCUSSION

### I.

■ We review the BIA's decision that Taha has not established eligibility for asylum and withholding of deportation under the substantial evidence standard. *Lata v. INS*, 204 F.3d 1241, 1244 (9th Cir.2000). The BIA's determination must be upheld if supported by reasonable, substantial, and probative evidence in the record, and may be disturbed only if Taha establishes "that the evidence he presented was so compelling that no reasonable factfinder could fail to find[eligibility for asylum]." *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

■ We review de novo claims of due process violations in removal proceedings. *Reyes–Melendez v. INS*, 342 F.3d 1001, 1006 (9th Cir.2003); *Cano–Merida v. INS*, 311 F.3d 960, 964 (9th Cir.2002).

■ We review for substantial evidence the factual findings underlying the BIA's determination that Taha was not eligible for relief under the Convention. *See Zheng v. Ashcroft*, 332 F.3d 1186, 1193 (9th Cir.2003); *Kamalthas v. INS*, 251 F.3d 1279, 1281 (9th Cir.2001).

### II.

■ Taha first argues that the BIA's opinion consists solely of conclusory statements and is not supported by substantial

evidence. Taha further submits that the discrepancies between his declaration and testimony were minor and revealed nothing about his fear for his safety. *See Akinmade v. INS*, 196 F.3d 951, 954 (9th Cir.1999) ("Minor errors or inconsistencies ... do not constitute a valid ground upon which to base a finding that an asylum applicant is not credible, particularly where those inconsistencies reveal nothing about an applicant's fear for his safety.").

Taha's arguments are unavailing. Far from relying solely on conclusory statements, the BIA explained the ways in which Taha's testimony varied from his asylum application and thus hampered his credibility.[2] The Board specifically noted that Taha testified that government agents detained him in 1989, beat him, and forced him to sit on a small bottle, causing injuries which later required bowel surgery, but his asylum application made no mention of this alleged event. The BIA similarly explained that Taha testified that government agents detained him in January 1994, beat him, stabbed him, and forced him to walk on broken glass before throwing him out on the street. As the BIA noted, however, Taha's application merely states that he was detained and interrogated, makes no mention ·of any physical abuse, and avers that he was released on his own recognizance after requesting legal counsel. Taha's argument that the BIA propounded no cognizable basis for its ruling must therefore fail: He plainly received individualized attention, and the BIA "heard, considered and decided" the relevant issues. *See Villanueva–Franco v. INS*, 802 F.2d 327, 330 (9th Cir.1986) ("[A]ll that is necessary is a decision that sets out terms sufficient to enable us as a reviewing court to see that the Board has heard, considered, and decided."); *see also Ghaly v. INS*, 58 F.3d 1425, 1430 (9th Cir.1995) ("All that we require is that the Board provide a comprehensible reason for its decision sufficient for us to conduct our review and to be assured that the petitioner's case received individualized attention.").

Nor may the discrepancies between Taha's testimony and application regarding the alleged persecution in 1989 and 1994 be dismissed as minor inconsistencies and omissions relating to unimportant facts. *See De Leon–Barrios v. INS*, 116 F.3d 391, 393 (9th Cir.1997) ("Generally, minor inconsistencies and minor omissions relating to unimportant facts will not support an adverse credibility finding." (citing *Osorio v. INS*, 99 F.3d 928, 931 (9th Cir. 1996))). The 1989 and 1994 incidents form the very heart of Taha's claim of past persecution and fear of future persecution. *See id.* at 393–94 (discrepancies not minor where they "relate[d] to the basis for [the claimant's] alleged fear of persecution" and "involved the heart of the asylum claim") (internal quotations omitted). Yet Taha did not even mention the 1989 incident in his application, and did not mention any violence in association with the 1994 incident. These major discrepancies cast serious doubt on whether the 1989 and 1994 incidents even occurred, and provide substantial evidence supporting the BIA's determination that Taha did not establish eligibility for asylum. *See Pal v. INS*, 204 F.3d 935, 938 (9th Cir.2000). Taha's arguments to this court certainly do not compel a finding to the contrary. *See Elias–Zacarias*, 502 U.S. at 483–84, 112 S.Ct. 812;

---

**2.** The government concedes that the BIA failed to make an explicit credibility finding. *See Ordonez v. INS*, 345 F.3d 777, 786 n. 5 (9th Cir.2003); *Shoafera v. INS*, 228 F.3d 1070, 1075 n. 3 (9th Cir.2000) ("[T]he law of this circuit does not permit implicit adverse credibility determinations."). This issue may not form the basis of our ruling, however, because Taha did not raise it on appeal. *Ordonez*, 345 F.3d at 786 n. 5.

*Monjaraz–Munoz v. INS*, 327 F.3d 892, 895 (9th Cir.2003) ("Under [our] 'extremely deferential' standard, we 'must uphold the [Board]'s findings unless the evidence presented would *compel* a reasonable finder of fact to reach a contrary result.' ") *(quoting Singh–Kaur v. INS*, 183 F.3d 1147, 1149–50 (9th Cir.1999)).[3]

### III.

■■■ Taha additionally argues that the BIA and IJ violated his due process rights by failing to afford him a meaningful opportunity to address the inconsistencies between his asylum application and testimony before the immigration court. The Fifth Amendment guarantees due process to individuals who are subject to removal proceedings, *Agyeman v. INS*, 296 F.3d 871, 876–77 (9th Cir.2002), but we will reverse a BIA decision on due process grounds only "if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir.2000) (internal quotations omitted).

■ No such fundamental unfairness took place here. Taha and his counsel spent the better part of a day on direct examination, but neither chose to address the discrepancies between Taha's application and testimony. The government's counsel then devoted his entire cross-examination to this issue, giving Taha ample opportunity to explain or address the discrepancies. Taha essentially gave no explanation for the discrepancies on cross-examination, however. Taha's counsel then declined to conduct a redirect examination. Taha was thus given every reasonable opportunity to present his case before the IJ. *Id.* His failure to do so

persuasively does not constitute a due process violation.

Nor did the BIA fail to afford Taha a meaningful opportunity to address the discrepancies on appeal. The IJ expressly found that Taha had "failed to allege important events in his declaration that he alleged in his testimony." This finding put Taha on notice "that the veracity of [his] entire testimony was thrown into question," and made it his responsibility "to explain all the inconsistencies in [his] testimony" before the BIA. *Pal*, 204 F.3d at 939. Taha nevertheless offered no explanation on appeal to the BIA, except that "cultural factors" caused his testimony to appear inconsistent and disjointed. The BIA considered and properly rejected this explanation, noting that Taha is an educated man, was represented by competent counsel, and was asked very specific questions during the proceedings. The BIA thus afforded Taha a reasonable opportunity to address the discrepancies between his application and testimony, and properly considered and ruled upon his proffered explanation.

Taha further contends that the IJ violated his due process rights by prejudging his claim and denying him a fair hearing. We have held that "[a] neutral judge is one of the most basic due process protections," *Reyes–Melendez*, 342 F.3d at 1006, and reversed where "the IJ behaved not as a neutral fact-finder interested in hearing the petitioner's evidence, but as a partisan adjudicator seeking to intimidate [the applicant] and his counsel." *Colmenar*, 210 F.3d at 971.

■ The record demonstrates that the IJ may have had some preconceived notions about Taha and his claim even before

---

**3.** Because Taha failed to satisfy the lesser standard of proof required to establish eligibility for asylum, he necessarily failed to demonstrate eligibility for withholding of deportation. *Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996) (en banc).

he testified substantively, and then directed several inappropriate comments to Taha and his counsel during the hearing. While unfortunate, this behavior did not violate due process. We start from the presumption that the IJ was unbiased, *see Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982), and recognize that

> judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.... *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger....

*Liteky v. United States*, 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). The comments at issue here were plainly "expressions of impatience, dissatisfaction, annoyance, and even anger" rather than indications of "such a high degree of favoritism or antagonism as to make fair judgment impossible." Although the IJ frequently expressed her impatience and dissatisfaction with Taha and his counsel, she did not demonstrate bias or partiality until after Taha had finished presenting his case in chief on direct examination. At that point, of course, the IJ was entitled to make up her mind. As a result, the IJ's actions did not indicate such a "high degree" of favoritism as to render a fair judgment impossible.

■ We have upheld due process challenges based in part on injudicious commentary only where the IJ "took over" the direct examination or otherwise denied claimants a reasonable opportunity to present their evidence. *See Reyes–Melendez*, 342 F.3d at 1004, 1006–07 (the IJ "took over" at least 38% of the direct examination); *Sanchez–Cruz v. INS*, 255 F.3d 775, 779 (9th Cir.2001) (the IJ "refused to allow the petitioner to introduce evidence that specifically contradicted some of his [the IJ's] factual findings"). No such facts appear here. The IJ allowed Taha a very lengthy direct examination, did not bar him from testifying as to any subject, and never "took over" the examination. As a result, despite her inappropriate comments, the IJ permitted Taha a full and fair opportunity to present his case sufficient to satisfy his due process rights.

## IV.

■ Finally, Taha relies on *Kamalthas v. INS*, 251 F.3d 1279 (9th Cir.2001), and *Mansour v. INS*, 230 F.3d 902 (7th Cir. 2000), to argue that the BIA erred by failing to independently evaluate his claim for relief under the Convention.

In *Kamalthas*, we relied on *Mansour* to find that the BIA may not allow an adverse credibility finding to "wash over" a claim brought under the Convention where the evidence suggests an independent ground for granting such relief. 251 F.3d at 1284. We held that although the applicant, a member of the Tamil ethnicity/social group, had failed to establish asylum eligibility based on alleged past persecution by Sri Lankan police, the evidence suggested that "Tamil males have been subjected to widespread torture in Sri Lanka." *Id.* The *Mansour* court similarly noted that regardless of the applicant's asylum status, the evidence suggested "that the Iraqi government has engaged in abuses against the Assyrian Christians, a minority [of whom the applicant was a member], who are living in Iraq." 230 F.3d at 907. Thus, where the evidence suggests

that members of the applicant's minority group may be more likely than not subject to torture, the applicant's specific credibility becomes largely irrelevant, and the BIA must conduct a separate evaluation under the Convention. *Kamalthas,* 251 F.3d at 1284; *see also Al–Harbi v. INS,* 242 F.3d 882, 891–94 (9th Cir.2001) (despite adverse credibility finding, Iraqi petitioner had a well-founded fear of future persecution because evidence of country conditions supported the conclusion that the Iraqi government would persecute as traitors any evacuees who returned to Iraq).

*Kamalthas* and *Mansour* are plainly distinguishable from the present facts. Taha has presented no evidence that he is a member of any ethnic, religious, or social minority suffering torture or other abuses by the Sudanese government. Taha's claim under the Convention is instead based on the same testimony that the BIA found incredible. Taha points to no other evidence that the BIA should have considered in making its determination under the Convention. Therefore, because we affirm the BIA's determination that Taha failed to establish eligibility under the Convention, we must similarly affirm its rejection of Taha's claim under the Convention Against Torture.

**PETITION DENIED.**

KOZINSKI, Circuit Judge, dissenting:

We owe substantial deference to the BIA's credibility determinations. *See Gui v. INS,* 280 F.3d 1217, 1225 (9th Cir.2002). But substantial deference is not code for rubber stamp. As we have said before: "We do not accept blindly ... [the BIA's] conclusion that a petitioner is not credible. Rather, we examine the record to see whether substantial evidence supports that conclusion, and determine whether the reasoning employed ... is fatally flawed." *Aguilera–Cota v. INS,* 914 F.2d 1375, 1381

(9th Cir.1990). The record in this case clearly supports a finding that Farah Taha is credible. Farah Taha's testimony recounted horrific instances of torture in specific detail, which he then corroborated with medical evidence, including a letter from his physician. The IJ ignored the physician's assessment that Farah Taha had been the victim of torture and laughed at his testimony. The BIA upheld the IJ's decision, finding "no error." A.R. at 2.

Rather than look closely at the whole record, as we are required to do, the majority simply signs off on the BIA's superficial analysis. In so doing, my colleagues abdicate their responsibility and deprive Farah Taha of his fair chance to gain asylum.

### Credibility

1. The BIA offered several grounds supporting its decision that Farah Taha was not a credible witness. First, the BIA noted the "unexplained and unresolved discrepancies between allegations in his testimony and his asylum application." *Id.* Though Farah Taha's testimony offered considerably more detail than his asylum application, there is nothing inconsistent about the two accounts. In the asylum application, Farah Taha explained his affiliation with the Umma Party. He offered details about the history of the party and explained that, after the military coup in 1989, he "followed the party's tactics and strategies in resisting the regime," which "created a severe friction with security elements and spies of the regime inside the department." *Id.* at 261. In his testimony, Farah Taha elaborated that he distributed flyers and wrote anti-government messages on walls. This led to his detention, during which he was subjected to physical torture. By contrast with most adverse credibility cases, in which inconsistencies generally refer to conflicting state-

ments, *see, e.g., Wang v. INS*, 352 F.3d 1250, 1254–55 (9th Cir.2003), nothing about these two accounts is contradictory; one merely offers more detail than the other.

Farah Taha also wrote in his asylum application that he was arrested outside his garage in 1994 and was "questioned about pamphlets that were circulating around the city." A.R. at 261. He wrote that he "was kept overnight, and the following morning the interrogation continued." *Id.* He was finally granted legal counsel and was "released on [his] personal recognizance, but only after [he] was forced to sign an affidavit to report daily to the headquarters." *Id.* at 261–62. He elaborated in his testimony that, during this detention he was forced to walk on glass, and was beaten severely. In both accounts, Farah Taha claimed he was picked up from outside his garage, interrogated and released the next morning. Though he put it more gingerly in his asylum application by explaining that he was "released on [his] personal recognizance"—a legal term signifying that no charges were brought against him—this account is entirely consistent with his testimony that "[a]round 4:00 or 5:00 in the morning they threw me outside while I was still dizzy." *Id.* at 153.

We have repeatedly held that the "failure to file an application form that was as complete as might be desired cannot, without more, properly serve as the basis for a finding of a lack of credibility." *Aguilera–Cota*, 914 F.2d at 1382; *see also Akinmade v. INS*, 196 F.3d 951, 956 (9th Cir.1999); *Lopez–Reyes v. INS*, 79 F.3d 908, 911 (9th Cir.1996) ("It is well settled that an applicant's testimony is not per se lacking in credibility simply because it includes details that are not set forth in the asylum application."). This is especially so where, as here, there are "*no* contradictions between the information set forth in the ap-

plication and [the] … testimony," and there is no indication that petitioner "lie[d] or misrepresent[ed] facts on his asylum application." *Aguilera–Cota*, 914 F.2d at 1382.

The reasoning behind this rule is that asylum applications often are not prepared by lawyers but by applicants "who do not speak English and are unable to retain counsel. Under these circumstances, the IJs cannot expect the answers provided in the applications to be as comprehensive or as thorough as they would be if set forth in a legal brief." *Id.* We have also recognized the tendency for applications prepared without a lawyer to "focus on different aspects of … [the alien's] experiences," and have held that "[a]ll that can be concluded from the different focus … is that the … [non-lawyer] and the lawyer reached different conclusions as to what parts of … [the] story provided the basis for asylum relief." *Chanchavac v. INS*, 207 F.3d 584, 588 n. 2 (9th Cir.2000).

Farah Taha's asylum application was prepared not by a lawyer, but by a friend of his. Clearly, the friend had command of the English language, and offered a fair amount of detail concerning the history of the Umma Party and Farah Taha and his family's involvement in it. However, that the friend was a competent writer and offered some detail does not mean that he had any understanding of our immigration laws or that he knew which facts would be most helpful to Farah Taha's asylum claim. It is entirely possible that Farah Taha and his friend believed the crucial issues to be the history of the Sudan and Farah Taha's role in the Umma Party. They may not have understood, as Farah Taha's lawyer did, that the BIA would be more interested in the particular instances of torture that Farah Taha experienced, or that the

asylum application would be the appropriate place to describe that torture.

It is also evident from the record that details of Farah Taha's torture may have been omitted from his asylum application because of their painful and intimate nature. Farah Taha stated throughout his testimony that he had never previously spoken about these incidents. When first describing being forced to sit on a glass bottle for seven hours, Farah Taha said, "I have never said this to anyone yet." A.R. at 132. He then explained that he did not seek medical attention immediately after this incident out of shame:

A. After they release you, I mean, you're embarrassed to go out on the street. You have to clean yourself and all that. You have to go at night because you're embarrassed to walk out on the street like that.

Q. Did you seek medical attention, sir?

A. I cannot go to a doctor.

Q. So did you get any kind of medical attention for yourself?

A. We have some kind of plant that takes away the wounds, heals the wounds. That's all because I cannot go to a hospital. I can't even say this to any—in front of anybody.

Id. at 134. The lack of detail in Farah Taha's asylum application, as compared with his testimony, thus may reflect nothing more than his embarrassment and shame at revealing such personal and painful experiences in a formal application to the immigration authorities, particularly when he had to dictate everything to a friend.

More importantly, Farah Taha's testimony did not stand on its own. At least some of it was corroborated by documentary evidence in the administrative record. See Aguilera–Cota, 914 F.2d at 1382–83 ("A failure to state each and every ground

for a claim of political asylum at the time of the initial application should not prejudice that claim, and particularly not where the petitioner subsequently provides documentation to support his testimony."). Farah Taha presented a letter from his doctor, the authenticity or accuracy of which the government did not challenge, explaining that Farah Taha's "p[h]ysical exam revealed multiple scars on arms and legs. His bodily injuries were the result of physical abuse and torture while he was in prison in his country [S]udan in 1994." A.R. at 22. He also offered photographs of those scars, id. at 23–26, and showed the actual scars to the IJ during his testimony, id. at 151–52. Neither the BIA nor the IJ addressed this evidence or attempted to reconcile it with the determination that Farah Taha's story was fabricated.

2. The BIA also "agree[d] with the Immigration Judge that the respondent's lack of specificity in his testimony, addressed in detail in her decision, was not resolved by the respondent and degraded his credibility." Id. at 2. The IJ had offered the following explanation for her finding:

The testimony of the respondent was very choppy. He jumped around a lot and he was extremely difficult to follow. He would make a statement and then deny it on the next breath. He would be talking about something and then all of the sudden and for no reason whatsoever started describing some other event in some other point in time. He would often refer to "they" and "them" and when asked questions about his own torture, he would talk in the abstract as to the things that happened to people using those terms instead of describing what happened to him.... So it appears that at all times when the respondent was describing these horrible tortures that he claims to have suffered, he was probably testifying from things that he has heard that happened to other people

because that's the way he preferred to describe them. Instead of using the pronoun "I," or what happened to "me," he would be saying as what happened to "them" and things that are done to "those people" that endured these things. Always in the abstract.

*Id.* at 39–40.

Although some of Farah Taha's answers to preliminary questions may not have been perfectly responsive,[1] his testimony concerning his torture at the hands of the Sudanese government was quite specific. Contrary to the IJ and the BIA's findings, Farah Taha described his experiences in excruciating detail. He spoke in the first person and made it clear that all this had happened to him. For example, when asked about the 1989 incident, Farah Taha testified:

> A. They take off your clothes and they have you sit on glass, you know, glass Coke bottles. I have never said this to anyone yet.
>
> Q. So did that happen to you?
>
> A. Um-huh. Yeah.
>
> Q. I can't visualize, sir, exactly what you mean. You took off your clothes and were forced to sit on—was it broken glass or bottles or what?
>
> A. They put handcuffs on your hands and put them back and they handcuff your legs. They have you sit on, you know, those small Pepsi bottles, they have you sit on top of that. Like the beer bottles here.
>
> Q. One bottle or more than one bottle, sir?
>
> A. One. That was the first and last time they sat me on that.

> Q. And what happened to you as a consequence of doing that?
>
> A. I had surgery in Saudi Arabia in the year '95–'96 exactly.
>
> Q. What kind of surgery?
>
> A. I didn't have control with the bowel movement, but now I'm fine. I had a surgery.
>
> Q. How long were you forced to sit on the Coke bottle, sir?
>
> A. They pressure you until they start bleeding.
>
> Q. How long were you forced to sit on the bottle, sir?
>
> A. I stayed there from seven hours and—I mean, you're even embarrassed to go out on the street because your body from the rear is all blood and stuff.

*Id.* at 132–33.

Farah Taha used equal detail to describe the 1994 incident:

> A. I was exposed to walking on glass, broken glass, to go into that room.
>
> Q. Okay. When you say you were exposed to walking on glass, sir, were you—did you have shoes on?
>
> A. No.
>
> . . . .
>
> Q. And about how far were you forced to walk on glass in this manner?
>
> A. Not—not too much. Approximately two meters, maybe a meter and—and a half.

*Id.* at 148–49. Farah Taha then explained that, after being forced to walk on glass, he was repeatedly beaten. Again, his testimony was replete with detail and he was clearly recounting events that happened to him, not giving an abstract account of

---

1. For example, when asked by his counsel whether he "ever belong[ed] to any political party or group," Farah Taha responded, "[w]e are a political family. We're well known in Sudan." A.R. at 103. When asked the question again, he responded more directly: "Yes, I'm a member of Al–Umma Party." *Id.*

things he had heard from others. He testified:

A. ... [T]hey handcuffed my hands. In the beginning my legs were handcuffed only and there was a chain and then after Khaled came, my hands were also handcuffed.

Q. Anything else happen, sir?

A. They—they hit me with the suung[2] on my hand and my legs, of course.

. . . .

Q. ... What did they do with the suungs to you?

A. I was hit in the hand. He was pushing my shoulder and then hit my hand, but the one on the leg, it went all the way to the bone.[3]

. . . .

Q. Okay, sir. On the wrist, how did you get that scar? What did they do with the suung?

A. He was talking and he said, "Bring him water." I said, "How am I going to drink it?" So they released my hands. He said, "I'll give you water," and I was trying to drink the water and it had a very foul smell. I mean, it smelled like human urine. So I put it down. He—when I put the glass down, the—the guy behind me, he said, "You're having fun here? You think you're having fun? You think you can ask whatever you want to ask? You think you're sitting on your mother's lap? One time you want water. One time you want an attorney." And so he approached to hit me and I put my hand up to stop him and it hit my hand.

*Id.* at 150–52. It is difficult to see how either the IJ or the BIA could find this testimony lacked specificity. Farah Taha remembered what was said, offered names and even gave approximate distances. Even under the highest standard of deference, the BIA's determination that Farah Taha's testimony was not sufficiently specific should not be upheld.[4]

---

2. Farah Taha described a suung as a weapon similar to a bayonet. A.R. at 151.

3. As noted by counsel during his testimony, Farah Taha then indicated a scar on his left wrist approximately three inches in length and one on his leg above the knee of similar length. A.R. at 151–52.

4. It is, moreover, troubling that the BIA would rely entirely on the IJ's determination that Farah Taha's testimony lacked specificity, without offering any of its own examples to support its conclusion. Even the government conceded during oral argument that the IJ conducted a poor hearing. As Farah Taha testified about losing his job as a mechanic's assistant because of his political beliefs, the IJ burst out into laughter. Though she apologized, her apology was not very convincing. The IJ said: "The testimony of the respondent became so incomprehensible as to raise the emotions of the Court to such a degree that the Court lost her composure and began to laugh uncontrollably because of the *silliness of the testimony*. ... Maybe something did happen that was serious, but it sure did not come out from the testimony as though it was anything related to reality or anything related to any event that would have caused anybody to have fear." A.R. at 123–24 (emphasis added).

Later in the hearing, after listening to Farah Taha's full testimony about the various tortures he suffered and before any cross-examination had taken place, the IJ told the government attorney: "I think ... I know where this case is going. I pretty much know what my decision is going to be at this point, but by all means if you feel compelled to enlighten me with your cross examination, but remember that I have already made up my mind about the evidence ...." *Id.* at 188. Often, a good test of credibility is how well one's story stands up to cross-examination. The IJ never considered this possibility and passed judgment before the government lawyer even asked his first question.

Though the IJ's conduct may not rise to the level of a due process violation, it certainly showed the kind of partiality and bias that warrants particularly close scrutiny on review, which it did not receive.

Considering the whole record, the BIA exaggerated the importance of the "discrepancies" between Farah Taha's testimony and his asylum application, and was simply incorrect in finding Farah Taha's testimony was not specific. A comparison of Farah Taha's asylum application and his testimony does not reveal a single contradiction; they are easily reconciled. Everything else in the record—the detailed accounts of torture in Farah Taha's testimony, the physician's statement, the conspicuous scars on his body—all point to his story's veracity. I would thus find that this is one of the rare instances where a different result than the BIA's is compelled. *See INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

### Convention Against Torture

The majority also contravenes our holding in *Kamalthas v. INS,* 251 F.3d 1279 (9th Cir.2001), by finding that the BIA did not err when it declined to independently evaluate Farah Taha's Convention Against Torture claim. The IJ addressed Farah Taha's Convention claim in one conclusory sentence: "It is furthermore the order of this court that the respondent's application for relief under Article 3 of the Torture Convention be and his [sic] hereby denied." A.R. at 42. The BIA added nothing more. The majority holds that this was a proper resolution of the issue, finding that an adverse credibility determination was sufficient to preclude Farah Taha's claim under the Convention.

In *Kamalthas,* however, we held that an adverse credibility finding in petitioner's asylum claim does not end the Convention Against Torture inquiry. Just as in our case, the BIA found that Kamalthas's accounts of torture in his native country, Sri Lanka, were not credible based on his demeanor, "the fact that others had told

'the exact same story,' " and the fact that Kamalthas had told the INS airport inspector that he'd had no trouble with the Sri Lankan police. The BIA then applied this adverse credibility finding to reject Kamalthas's claim under the Convention. *Kamalthas,* 251 F.3d at 1282–83. We vacated the BIA's decision, holding that this was not a sufficient basis for rejecting Kamalthas's Convention claim, because the Convention also requires the BIA to consider "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal" and "[o]ther relevant information regarding conditions in the country of removal," and these issues needed to be addressed before a determination could be made. *Id.* at 1282 (citing 8 C.F.R § 208.16(c)(2)) (emphasis omitted). We elaborated that " '[w]e are not comfortable with allowing a negative credibility determination in the asylum context to wash over the torture claim.' ... Indeed, proper attention to relevant country conditions might lend credence to Kamalthas's assertions of torture and cause the BIA to view them in a different light." *Id.* at 1284. This is especially applicable in our case, where the adverse credibility determination rests on even shakier ground than in *Kamalthas.*

The majority claims that our case is distinguishable because, in *Kamalthas,* there was specific evidence of country conditions in the record, indicating that petitioner's minority group would be subject to torture in Sri Lanka. The majority finds that, by contrast, there was "no evidence that [Farah Taha] is a member of any ethnic, religious, or social minority suffering torture or other abuses by the Sudanese government." Maj. op. at 630. But just because Farah Taha is not a member of "any ethnic, religious, or social minority suffering torture," that does not mean that he may not be subject to torture. As a member of the Umma Party—a political

minority—and a vocal opponent of the Sudanese government, he may be even more likely to be subject to government abuse. As the Sudan Country Report on Human Rights Practices for 1998 noted:

The Government's human rights record remained extremely poor, and it continued to commit numerous, serious abuses. Citizens do not have the ability to change their government peacefully. Government forces were responsible for extrajudicial killings and disappearances. *Government security forces regularly tortured, beat, harassed, arbitrarily arrested, and detained opponents or suspected opponents of the Government with impunity.*

A.R. at 201 (emphasis added). The 1999 Country Report also supports this:

... [T]he Government's official and unofficial security forces continued to torture and beat suspected opponents and others. Security forces tortured youths, student leaders, and others whom they deemed opponents of the Government. The Government reportedly harassed, detained, and tortured lawyers whom they viewed as political opponents.... *[T]he U.N. Special Rapporteur on Torture described torture as a fairly extensive problem.*

*Id.* at 221–22 (emphasis added). As *Kamalthas* noted, these accounts may not only be indicative on their own that Farah Taha faces torture if deported, but also "might lend credence to ... [petitioner's] assertions of torture and cause the BIA to view them in a different light." *Kamalthas,* 251 F.3d at 1284.

Of course, it is not our job to make the initial determination on this issue. As the Supreme Court noted in *INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002), where the BIA has not considered an issue, it is not the job of the court of appeals to decide it in the first instance.

The Court reasoned: "The agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides." *Id.* at 355–56. The majority, however, ignores this and decides on its own that Farah Taha does not have a cognizable claim. Rather than make conclusory statements about whether Farah Taha will be subject to torture if deported, I would remand this case to the BIA for a much closer and more careful look.

