# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1386

FERUZ Y. EMEME,

*Petitioner*,

v.

JOHN D. ASHCROFT, ATTORNEY GENERAL
OF THE UNITED STATES,

*Respondent.*

———————

Petition to Review an Order of the
Board of Immigration Appeals.

———————

ARGUED DECEMBER 5, 2003—DECIDED FEBRUARY 12, 2004

———————

Before FLAUM, *Chief Judge*, and MANION and WILLIAMS, *Circuit Judges*.

FLAUM, *Chief Judge*. Feruz Y. Ememe, a native and citizen of Ethiopia, petitions for review of a final order of removal issued by the Board of Immigration Appeals on January 17, 2003, summarily affirming an immigration judge's order denying her application for asylum and withholding of removal. The immigration judge rejected Ememe's testimony because he found that it was not supported by any corroborating evidence, and further because he found it inconsistent with information she had given at her credible fear interview. Ememe's credible fear in-

terview was conducted through a translator of Italian, whereas her testimony before the immigration judge was aided by a translator of Amharic, Ememe's native language. Yet, absent from the immigration judge's assessment of Ememe's credibility was any consideration of Ememe's ability to comprehend the questions posed at the credible fear interview. Because we conclude that a determination of Ememe's Italian language skills is of crucial import to the disposition of her asylum and withholding of removal applications, we remand for further proceedings.

## I. Background

According to her testimony before the immigration judge, Feruz Ememe is a twenty-seven year-old ethnic Oromo from Ethiopia who claims to have been tortured while detained by the Mengistu and Tigrian regimes. She seeks asylum on the basis of her Oromo ethnicity and the Ethiopian government's alleged persecution of her family and herself.

Ememe testified that she was born in Addis Ababa, Ethiopia into the Oromo tribe, and that she is a native speaker of the Amharic language. She stated that she had six years of formal education in Ethiopia. Ememe represented that her father was a supporter of the Oromo Liberation Front ("OLF"), and that he was arrested for fundraising for the OLF by the Tigrian Liberation Front ("TLF") government on February 21, 1990. The following day, the police returned to arrest Ememe's mother, but she could not be found. Ememe testified that the TLF officers arrested Ememe and her brother, allegedly because of their Oromo ethnicity.

Ememe testified that she was detained for five months. During the second month of her detention, she alleges that she was raped by a police officer, rendering her unconscious. Three weeks later, the police officer returned with two other police officers, all of whom she claims raped

her. Ememe stated that she became sick and was taken to the prison hospital, where it was determined that she was pregnant. She represented that she miscarried the pregnancy a few months later. Ememe's mother eventually arranged for Ememe to be released from detention, according to her testimony.

Ememe further testified that, upon her release from prison, she learned that her father had been beaten to death in prison, and that her brother's whereabouts were unknown. Ememe related that, in 1992, her mother was arrested, and she decided to leave Ethiopia. Ememe fled to Italy with the aid of her sister who was living there. Shortly after arriving there, Ememe said she learned that her mother had died in prison, and that her sister had a heart attack and passed away upon learning of the death of their mother. At her sister's funeral, Ememe believes that she saw one of the police officers who had raped her while she was detained in Ethiopia.

Ememe testified that she worked as a housekeeper in the home of an Italian woman during the seven years that she spent in Italy. She explained that she rarely left her employer's home because she was depressed and scared. In 1999, Ememe's Italian employer procured a fraudulent Italian passport for her, and Ememe departed from Italy for the United States. She arrived at O'Hare International Airport on July 19, 1999. Upon arrival, Immigration and Naturalization Services ("INS") officers interviewed her with the aid of an Italian translator.

 Subsequently, on July 29, 1999, an asylum officer of the INS interviewed Ememe to determine whether she had a credible fear of returning to Ethiopia. Ememe was represented by counsel at the interview, and Ememe claims that she asked her attorney to obtain an Amharic language interpreter. When the attorney determined that no Amharic interpreter was available from the INS telephone translator

service, Ememe was furnished with an Italian translator. Before the immigration judge, Ememe testified: "I was able to explain myself in the Italian language . . . but I, I don't express myself as I do in my own language. That's a difficulty that I had [during the credible fear interview]." Ememe also explained that "there are some mistakes, some misunderstandings on the—either on my part, or on their part, but it's not correct that—what the statement has been written."

The transcript of this interview shows that the asylum officer asked Ememe seventy-one questions, most of which were pre-prepared. Ememe answered the majority of the questions with one-word or short answers, although a few of her answers consisted of one or two sentences. Relevant selections from the transcript are excerpted as follows:

Q:  What languages do you speak?

A:  ITALIAN.


Q:What is the highest level of formal education that you completed?

A:  IN ETHIOPIA TWELVE YEARS OF SCHOOL.


Q:  So far, have you been able to understand me?

A:  YES.


Q:  Are your parents alive?

A:  NO, BOTH DEAD.


Q:  Where is your family (spouse/children/parents)

now?

A:  NO FAMILY MEMBERS.


Q:  What race or ethnicity are you?

A:  AMHAERIC.


Q:  Have you ever been arrested in your country?

A:  NO.


Q:  Have you ever been a member of any political party or organization in your home country?

A:  NO, BUT MY FAMILY WAS ACCUSED OF GIV-ING MONEY TO OROMO ORGANIZATION AND THE GOVERNMENT KILLED MY FATHER AND THEY PUT ME IN JAIL FOR FIVE MONTHS WITH LITTLE TO EAT. MY MOTHER BAILED ME OUT AND MY SISTER HELPED ME ESCAPE TO ITALY WHERE SHE LIVED. MY BROTHER WAS ALSO IN PRISON BUT MY MOTHER COULD NOT BAIL HIM OUT. MY MOTHER WAS SHORTLY PUT IN JAIL WHERE SHE DIED IN PRISON.


Q:  Why did you leave your country?

A:  I WAS GOING TO SCHOOL AND DETAINED FOR ONE DAY AND THEN I WAS PICKED UP AT HOME BY FOUR POLICEMAN WITH THEIR FACES COV-ERED AND TAKEN TO THE PRISON FOR FIVE MONTHS.


Q:  Why were you arrested?

A: THEY DID NOT TELL ME.

Q: What happened to you in prison?

A: THEY PUT ME IN A SMALL ROOM AND FEED [sic] ME ONCE A DAY WITH ONE GLASS OF WA-TER.

Q: Do you think that anyone ever tried to coerce or intimidate you into doing something you didn't want to do?

A: YES, THEY TRIED TO RAPE ME WHEN I WAS PUT IN THE JAIL.

Q: Have your experiences affected you mentally or emotionally?

A: YES, VERY HORRIBLE MEMORIES.

Q: Do you believe that you have suffered mental or emotional torture?

A: YES, BECAUSE I LOST MY FAMILY, ESPE-CIALLY LOOSING [sic] MY MOTHER.

The asylum officer determined that Ememe had a credible fear of returning to Ethiopia and charged her as an alien who attempted to enter the United States by fraud, and as an alien who was not in possession of a valid immigrant visa or other entry document. Ememe conceded her removability before an immigration judge. Subsequently, on July 30, 2001, Ememe testified before the immigration judge.

At the hearing, Ememe chronicled the events that led

to her arrival in the United States, as summarized above. She submitted the following documentation in support of her claim: an Amnesty International News Release from November 1997 that reports a "government crackdown against alleged supporters of the Oromo Liberation Front"; the Amnesty International 1999 Ethiopia Annual Report; the United States Department of State 1999 Country Report on Human Rights Practices which states that the "government continued to detain persons suspected of sympathizing with or being involved with the OLF"; and a letter from Reverend Alvorson, the head of the Lutheran World Relief office in Chicago, attesting to a "flury" of arrests, jailings, disappearances of Oromo people in 1997. Ememe also submitted a diagnostic evaluation from the Marjorie Kovler Center for the Treatment of Survivors of Torture, which states that Ememe suffers from chronic post-traumatic stress disorder, major depressive disorder and headaches. Ememe attempted to admit into evidence a birth certificate issued in 1997, but the immigration judge excluded it on the grounds that it was fabricated, and that it had not been presented to the credible fear officer. Ememe testified that she had no documents to corroborate her testimony regarding her seven years of employment in Italy, her sister's death or funeral in Italy, the death of either of her parents, or her Oromo ethnicity.

The immigration judge concluded that three aspects of Ememe's claim warranted denial of her application. First, the immigration judge found Ememe's testimony not believable solely because of the perceived inconsistencies between Ememe's initial statement at the credible fear interview and her testimony before him. Second, the immigration judge noted that Ememe provided no documents to corroborate her testimony. Lastly, the immigration judge concluded that Ememe did not otherwise establish that she had endured past persecution or had a well-founded fear of future persecution. Thus, the immigration judge denied

Ememe's applications for asylum, withholding of removal, and protection under the Convention Against Torture.

Ememe appealed the immigration judge's decision to the Board of Immigration Appeals ("Board"). The Board summarily approved the immigration judge's decision without opinion, and Ememe now appeals.

## II. Analysis

An alien seeking asylum must establish that she qualifies for refugee status by showing that she is "unable or unwilling to return to, and is unable or unwilling to avail [her]self . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Ahmad v. INS*, 163 F.3d 457, 460 (7th Cir. 1999) (quoting 8 U.S.C. § 1101(a)(42)(A)). An alien seeking withholding of removal must show that "it is more likely than not that [she] would be subject to persecution on one of the specified grounds" should she return to his native country. *Id.*

In this case, the Board summarily affirmed the immigration judge's order without opinion. Thus, the immigration judge's decision constitutes the "final agency determination" for purposes of this Court's review. *See* 8 C.F.R. § 1003.1(e)(4) (2003); *Georgis v. Ashcroft*, 328 F.3d 962, 966-67 (7th Cir. 2003). We review the Board's decision to deny Ememe asylum and withholding of removal under the highly deferential substantial evidence test, *Mansour v. INS*, 230 F.3d 902, 905 (7th Cir. 2000), which requires us to affirm the Board's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

Ememe challenges the Board's final order of removal

on numerous grounds. First, she argues that the Board abdicated its responsibility to review the decision of the immigration judge when it affirmed that decision without issuing a separate opinion. This Court, however, has held that the "ability to conduct a full and fair appraisal of the petitioner's case is not compromised, and the petitioner's due process rights are not violated" by the streamlined procedure. *Georgis v. Ashcroft*, 328 F.3d 962, 967 (7th Cir. 2003). Therefore, Ememe's argument is unavailing.

Next, Ememe argues that the immigration judge improperly rejected her testimony on the basis of the variances between her credible fear interview and her subsequent testimony at the final hearing. In his oral decision, the immigration judge focused on the following inconsistencies: (1) Ememe's original statement of Amharic ethnicity, compared to the later indication of Oromo ethnicity; (2) Ememe's initial testimony of twelve years of formal schooling, which she subsequently reduced to six years; (3) Ememe's first description of rape was limited to an attempted rape, whereas Ememe later described multiple rapes. The IJ found no convincing explanation for these inconsistencies, despite Ememe's testimony regarding her difficulty communicating in Italian during her credible fear interview and her belief that the transcript of the credible fear interview represented translation errors.

Counsel for the INS questioned Ememe at length regarding each of these variances by juxtaposing the credible fear interview transcript with the seemingly inconsistent testimony Ememe provided on direct examination. The following exchanges between counsel for the INS and Ememe are illustrative:

> Q: "Question: what race or ethnicity are you? The answer: Amharic" [quoting from the transcript of the credible fear interview] . . . it does not say Oromo, it says Amharic.

> A: No, the question that she asked me was that—I

didn't know that she asked me my ethnicity. I thought the language that I speak, I told her Amharic, but I'm an Oromo, and—

Q: Today, you told me that you had six years of school . . . It says, "What is the highest level of formal education that you completed? Answer: In Ethiopia, 12 years of school."

A:  . . .I couldn't complete 12th grade on that age of my life, and I, I think she misunderstood me when she wrote 12.

Q:  The question says, "Do you think that anyone ever tried to coerce or intimidate you into doing something you didn't want to do? Answer: Yes, they tried to rape me. . . ." Would you agree . . . there's no place in this document that says anybody ever raped you?

A:  What I meant is that I was raped, not that I was tried to be raped. It's a language problem that she did not understand me, neither I didn't understand her probably very well in Italian language.

It appears from the transcript of the credible fear interview that Ememe's interviewer did not respond to Ememe's language difficulties even when they were readily apparent. For example, Ememe initially informed the interviewer that she had not been arrested in her country, but moments later stated that the Ethiopian government had detained her for five months. The interviewer did not pause to clarify the discrepancy. At oral argument, Ememe's counsel explained that Ememe believed the term "arrest" to imply a legal infraction by the arrestee, whereas her claim of asylum is based on the Ethiopian government's lawless detention of her on the basis of her Oromo ethnicity. The interviewer also failed to ask follow-up questions that might

have illuminated the issues that Ememe likely had difficulty communicating. For instance, when Ememe merely answered "Yes" to the question "Have you or any member of your family ever been mistreated or threatened by the authorities of the country where you may be returned," the asylum officer did not ask Ememe to elaborate on her one-word answer in the affirmative. Rather, the officer skipped to the next question regarding an unrelated matter.

Ememe's testimony in Italian appears constrained when read in conjunction with her rather verbose testimony before the immigration judge, which was delivered in Amharic. For example, at the credible fear interview, when asked how her experiences had affected her emotionally, Ememe responded "very horrible memories." In contrast, when asked "the result" of her imprisonment before the immigration judge, Ememe gave a comprehensive account of the mental anguish she suffered due to her imprisonment: "I wanted to commit suicide, I didn't have any opportunity, and I could not eat, I could not do anything. I was always in pain." Ememe also substituted complete sentences in Amharic for the one-word answers she had provided in Italian to the credible fear interviewer. Her relative unease in communicating in Italian is apparent.

It is not inconceivable that Ememe's Italian proficiency never progressed beyond basic comprehension despite her seven years of living in Italy. Ememe may have had no need to develop Italian language skills to accomplish her housekeeping responsibilities, and the relative solitude of the job may not have been conducive to language development. Ememe claims that she had little opportunity to converse with Italians because she was too fearful to leave her employer's home after she saw one of her rapists at her sister's funeral.

However, as the immigration judge made no assessment of Ememe's Italian language proficiency, we cannot eval-

uate whether the variances in her testimony represent a purposeful modification of her story, or merely the opportunity to better communicate it through her native language. If Ememe's testimony in Italian is not an accurate record of what she wished to communicate, but is only a rough approximation of what she believed herself to have communicated, then the perceived inconsistencies speak mainly to Ememe's language skills, and not clearly to her credibility. *See He v. Ashcroft*, 328 F.3d 593, 598 (9th Cir. 2003) (stating that "faulty or unreliable translations can undermine the evidence on which an adverse credibility determination is based"). Absent an evaluation of Ememe's language skills, the testimonial inconsistencies, alone, do not provide adequate support for the immigration judge's conclusion that Ememe's testimony was not credible. *See Balasubramanrim v. INS*, 143 F.3d 157, 164 (3d Cir. 1998) (finding that inconsistencies between a petitioner's airport statement and his testimony before an immigration judge were not enough, standing alone, to support the immigration judge's adverse credibility finding when the Board's assessment of the petitioner's language skills at the time he gave his airport statement was questionable).

This case is unlike *Mansour v. INS*, 230 F.3d 902, 906 (7th Cir. 2000), where this Court stated that "[w]ithout a concrete explanation other than the language difficulty for the discrepancy, we are given no other choice than to accept the BIA's adverse credibility determination." In *Mansour*, the petitioner denied before the immigration judge that he had been beaten, arrested, and imprisoned when he returned to Iraq after he had deserted the Iraqi army, in direct contradiction of the statement that he had attached to his application for asylum. *Id.* at 904. This denial not only totally negated his prior statement, but also undercut the persuasiveness of his claim for asylum. Mansour's asylum claim was based on his fear of retribution by the Iraqi government because of his supposed desertion of the

army; if Mansour had successfully returned to Iraq without experiencing any retribution, then his claim was less persuasive. In contrast, Ememe's testimony before the immigration judge did not directly contradict her statements at the credible fear interview, but rather offered a more fulsome explanation of the events that she had previously described. The later testimony did not undermine her earlier statement that she had been detained because of her Oromo ethnicity and her father's political support of OLF and that she had suffered sexual violence in prison, but rather confirmed and expanded upon what she had previously disclosed.

We conclude that, absent a conclusive determination of Ememe's Italian language skills, the immigration judge's characterization of her testimony as incredible is "not supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Zacarias*, 502 U.S. 478, 481 (1992). Therefore, we remand this case for additional investigation of Ememe's ability to accurately communicate in Italian at her credible fear interview. *See INS v. Ventura*, 537 U.S. 12, 17 (2002). If Ememe's testimony before the immigration judge is later found to be credible, then her failure to submit corroborating evidence is not be fatal to her claim. *See Georgis*, 328 F.3d at 969 ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."). Thus, we need not address Ememe's final challenge to the immigration judge's decision that she had demonstrated past persecution and a likelihood of future persecution in Ethiopia. All other arguments raised by the petitioner are without merit and do not warrant discussion.

## III.  Conclusion

The petition for review is GRANTED, the order of the immigration service is VACATED, and the matter is

REMANDED to the service for further proceedings consistent with this opinion.

A true Copy:

      Teste:

                _____

                *Clerk of the United States Court of Appeals for the Seventh Circuit*