In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2156

NATASHA RAMA, *et al.*,

*Petitioners*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

On Petition for Review of an Order of the
Board of Immigration Appeals Agency.
Nos. A077-650-672, 671, 673

ARGUED FEBRUARY 22, 2010—DECIDED MAY 28, 2010

Before KANNE and WILLIAMS, *Circuit Judges*, and
SPRINGMANN, *District Judge.*[*]

SPRINGMANN, *District Judge.*  In February of 2000, Alba-
nian natives Natasha Rama, Ferrick Rama, and Ledia Rama

---

[*] The Honorable Theresa L. Springmann, District Judge for
the United States District Court, Northern District of Indiana,
sitting by designation.

attempted to enter the United States without valid passports and subsequently applied for asylum. On July 13, 2004, an Immigration Judge (IJ) denied their request and ordered that they be removed. The Board of Immigration Appeals (BIA) affirmed without opinion on December 7, 2005. This petition followed. For the reasons set forth in the following opinion, we deny the petition for review.

## I. Background

On February 1, 2000, the Petitioners were stopped with fake passports at Chicago O'Hare International Airport by officers of the Immigration and Naturalization Services (INS).[1] Ferrick and Natasha were interviewed separately by the officers.

In Natasha's interview, she admitted using a fraudulently-obtained passport that had been issued to another resident of her native city. She claimed that she and her family had traveled to the United States because Ferrick had been involved in a car accident and owed a large sum of money to the owner of the damaged car. When the family was unable to pay the sum owed, the owner ransacked the family's house and poured scalding milk on nine-year-old Ledia's legs, permanently scarring

---

[1] On March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice and its functions were transferred to the newly formed Department of Homeland Security.

them. Natasha claimed that "[she] fear[s] for [her] husband and [her] daughter [if they were forced to return to Albania] because the man who threatened [her] husband's life works for the Albanian government." Admin. R. 647. When the officer asked Natasha how she knew that the person who threatened her husband and ransacked her house works for the Albanian government, she replied, "I don't know. I just assumed because he has a nice car." *Id.*

Ferrick was interviewed by an asylum officer on the following day. During his interview, Ferrick admitted that he had purchased fraudulent passports for himself, his wife, and his daughter for ten thousand dollars. He claimed that he came to the United States because, following an automobile accident in which he was involved, the owner of the damaged car had come to his home demanding money, and threw hot milk on his daughter. He stated that he feared for his life.

After these interviews, the asylum officers determined that the Ramas had not established *prima facie* eligibility for asylum and referred their cases for a hearing before an IJ. The INS commenced removal proceedings against the Ramas on February 17, 2000, by filing Notices to Appear (NTAs) charging them (1) under the Immigration and Nationality Act (INA) § 212(a)(6)(C)(I), 8 U.S.C. § 1182(a)(6)(C)(I), as aliens who, by fraud or willfully representing a material fact, sought to procure a visa, other documentation, or admission into the United States or benefit provided under the INA, and (2) under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), as immigrants who at the time of

application for admission were not in possession of valid unexpired immigration visas, reentry permits, border crossing cards, or other valid entry documents as required by the INA, and a valid unexpired passport, or other suitable travel document, or other document of identity and nationality required under the regulations.

Before the IJ, the Ramas conceded the charge that they were inadmissible because they did not possess valid passports or visas at the time of admission. On January 31, 2001, Natasha filed with the IJ her application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (CAT), with Ferrick and Ledia as derivatives.

In her asylum application, Natasha added numerous facts to those she gave to the INS officials at O'Hare airport. She now claimed the following: she was seeking asylum because of incidents she experienced in Albania that were a result of Ferrick's political activities. She stated that Ferrick had become the Council Chief of the Democratic Party for the village of Zharres in 1992. In 1997, when the Socialist Party took power in Albania, Ferrick received a letter from the police to present himself at the police station. Knowing that two other Democratic Party members had already been arrested, Ferrick chose to go into hiding rather than report.

In December 1999, Ferrick collided his automobile with another automobile containing two men. Ferrick identified one of the passengers as a former classmate and an Albanian police officer. The two men hit Ferrick and pointed their guns at him. They then demanded that he pay

them $30,000, or risk being arrested. Five days later, four masked men came to Natasha's home, searched the home for Ferrick, and threatened to kill the family if they could not locate Ferrick. After that incident, Natasha and her daughter moved to Natasha's parents' house.

Four days after moving in with her parents, four masked men came to that house, blindfolded and handcuffed Natasha and Ledia, and drove them to another house. During their three days in captivity, the men raped Natasha repeatedly, and threatened to kill her and Ledia if she did not reveal Ferrick's whereabouts. On the third day, one of the men threw hot milk on Ledia. The men then drove Natasha and Ledia to the hospital, where Natasha stayed for three days and Ledia remained for two weeks.

At the Merits Hearing before the IJ, Ferrick and Natasha gave testimony that largely conformed to Natasha's asylum application. Also testifying was Professor Bernie Fisher, who testified to the poor relationship between the Albanian Socialist and Democratic Parties, the Socialist Party's use of intimidation tactics, and the stigma attached to rape in Albania, which he said could explain Natasha's failure to mention the rape in her interview with INS officials.

On July 13, 2004, the IJ issued a written opinion finding the Ramas removable as charged and denying their application for asylum, withholding of removal, and protection under CAT. In a thorough opinion that contained a detailed recitation of the facts, the IJ made an adverse credibility determination based on inconsis-

tencies between the Ramas' statements at O'Hare Airport, and the claims made in Natasha's asylum application and the testimony before the IJ. Notably, the IJ found that during the airport interviews, the Ramas did not disclose any details regarding Natasha's rape, Ferrick's political involvement in the Democratic Party, the notice Ferrick had received ordering him to report to the police station, Ferrick's going into hiding, or the kidnaping of Natasha and Ledia. The IJ found that there was good excuse for the non-disclosure of the rape, but noted that "the omissions extend well beyond the multiple rapes to the very heart of [the Ramas'] claim: [Ferrick's] Democratic Party involvement." Admin. R. 179. Other inconsistencies cited by the IJ included inconsistencies between Natasha's testimony about her hospitalization and a medical certificate from the hospital that did not mention any injuries consistent with rape. Finally, the IJ found persuasive Ferrick's failure to submit evidence to corroborate his claimed leadership in the Democratic Party. While Ferrick did submit a letter confirming his *membership* in the party, the letter made no mention of a leadership position. Concluding, the IJ stated that "[the Ramas] have failed to meet their burden of proof in establishing eligibility for asylum . . . specifically, they failed to credibly establish that they suffered past persecution or have a well-founded fear of persecution." Admin. R. at 182-83. On August 9, 2004, the Ramas timely appealed the IJ's decision to the BIA. On December 7, 2005, the BIA summarily affirmed without opinion the IJ's findings.

## II. Analysis

### A. Standard of Review

Because the BIA summarily affirmed the IJ's decision without opinion, we base our review on the IJ's analysis. *See Hanaj v. Gonzales*, 446 F.3d 694, 699 (7th Cir. 2006). We review the IJ's denial of Natasha's petition for asylum and withholding of removal under the highly deferential substantial evidence test. *See Ememe v. Ashcroft*, 358 F.3d 446, 450 (7th Cir. 2004). Pursuant to this test, we must uphold the IJ's findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole; we may reverse the IJ's determinations only if we determine that the evidence compels a different result. *Id.* at 451; *see also* 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."). Similarly, the IJ's "[c]redibility determinations are questions of fact and should only be overturned under extraordinary circumstances, although they must be supported by specific, cogent reasons that bear a legitimate nexus to the finding." *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004) (quoting *Pop v. I.N.S.*, 270 F.3d 527, 530-31 (7th Cir. 2001)).

### B. Asylum

8 U.S.C. § 1158(b)(1) affords the Attorney General the discretionary authority to grant "asylum to an alien . . . if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of

this title." Section 1101(a)(42)(A) defines "refugee" as one who is unable or unwilling to return to her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." The burden of proof is on the Ramas to show that they are "refugees" and are thus eligible for asylum. *See* 8 C.F.R. § 208.13(a). "[C]redibility is the linchpin of a 'well founded fear' claim." *Balogun*, 374 F.3d at 498. Regarding a claim of well-founded fear of persecution, an applicant's burden "turns largely upon the applicant's own testimony and credibility." *Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004). The testimony of an applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. *Id.* However, if the IJ finds the testimony to be incredible, corroborating evidence is required. *Balogun*, 374 F.3d at 500.

In this case, we find that the IJ's credibility determination is supported by reasonable, substantial, and probative evidence on the record considered as a whole. The IJ relied on three reasons in entering an adverse credibility determination: (1) new factual assertions raised during the petitioners' testimony before the IJ that were not raised to the immigration officers at the airport; (2) the petitioners' testimony before the IJ concerning Ferrick's participation in the Democratic Party was inconsistent with the documentary evidence; and (3) Natasha's oral testimony concerning her hospitalization and the hospitalization of Ledia was inconsistent with the documentary evidence. We will address each reason, in turn.

### 1. New Factual Assertions

The IJ's first basis for questioning the petitioners' credibility is supported by reasonable, substantial, and probative evidence. As she noted, the petitioners did not disclose at the airport any details regarding Natasha's rape, Ferrick's political involvement with the Democratic Party, the notice that Ferrick received ordering him to the police station, the incident that caused Ferrick to go into hiding, or the kidnaping of Natasha and Ledia. The IJ accepted the petitioners' explanation that the rape may not have been mentioned because of the cultural and other difficulties of disclosing it, but noted that "the omissions extend well beyond the multiple rapes to the very heart of [the petitioners'] claim: [Ferrick's] Democratic Party involvement." She found unconvincing Ferrick's explanation that he did not discuss his political involvement at the airport interview because he did not know how much information to disclose.

The IJ also found the petitioners not to be credible because at the airport interview, Ferrick did not state the identities of his daughter's attackers by name, despite the fact that he was able to identify the men during the Merits Hearing. When pressed at the airport for their identities, Ferrick merely identified the men as people from "the city." The IJ found that the petitioners did not provide any explanation to resolve the inconsistency and that their failure to do so was a specific reason to support an adverse credibility determination.

### 2. Ferrick's Involvement with the Democratic Party

The next factor upon which the IJ relied was Ferrick's testimony that he was the town leader of the Democratic Party, which was not consistent with the letter Ferrick obtained verifying his membership. The letter did not mention that Ferrick had any leadership position. The IJ held that "it is reasonable to expect him to submit a letter confirming his position as an elected leader[,] something significantly different from mere membership" in light of his submission of a letter from the Democratic Party. We find the IJ's reasoning sound and cannot say that it was not based on reasonable, substantial, and probative evidence in the record.

### 3. Natasha's and Ledia's Hospitalization

Third, in making her adverse credibility determination, the IJ determined that Natasha's medical statement from the time of her hospitalization indicates that she was about three months pregnant, and was admitted for treatment of an "incipient abdomen." The medical documentation did not reference torn clothes, bruises, or cuts on Natasha's body, as she had claimed. Based on these inconsistencies, the IJ found Natasha's testimony about her rape "disingenuous." The IJ also found that the medical certificate indicated that Natasha was hospitalized for eight days, but Natasha testified that she had been hospitalized for three. Natasha testified that Ledia was hospitalized for twelve days, but the medical certificate indicated that Ledia had been hospitalized for ten. The IJ determined that Natasha's explanation that she

could not recall the number of days that Ledia remained in the hospital to be "unconvincing especially in light of the previous discrepancies regarding [Natasha's] own alleged hospitalization." Admin. R. at 181. That the IJ relied on the medical certificate as well as testimony to reach her adverse credibility determination on this point shows us that the determination was based on reasonable, substantial, and probative evidence in the record.

For this Court "[t]o reverse the BIA finding we must find that the evidence not only *supports* [reversal], but *compels* it." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). The IJ found the Ramas' claim of fear to be not credible, and she cited specific, cogent reasons that bore a legitimate nexus to that finding. Because the evidence does not compel reversal, we will affirm the IJ's denial of the Ramas' asylum claim, and the BIA's summary affirmance of the IJ's decision.

## C. Withholding of Removal

8 U.S.C. § 1231(b)(3) provides that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." In order to gain relief under this Section, "the applicant must demonstrate a clear probability of persecution," which is "a much more demanding burden" than is found in the asylum context. *Capric*, 355 F.3d at 1095. Therefore, as we have often

said, "if an applicant's asylum claim fails, his withholding of deportation claim will also necessarily fail." *Id.* This rule includes those claims for withholding of removal under CAT. *See Aung v. Gonzales*, 495 F.3d 742, 747 (7th Cir. 2007). Because we have found that the IJ's decision denying Natasha's asylum claim fails, we must also uphold her decision denying Natasha's claim for withholding of deportation.

### III. Conclusion

For the foregoing reasons, the petition for review is DENIED.