NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 30, 2013
Decided May 24, 2013

**Before**

JOEL M. FLAUM, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 12-3118

HALYNA RUPTASH,
    *Petitioner*,

    *v.*

ERIC H. HOLDER, JR.,
Attorney General of the United States,
    *Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.

No. A099 339 776

**O R D E R**

Halyna Ruptash fears persecution if she were returned to her native Ukraine, based on police hostility toward her Russian ethnicity and her prior political advocacy on behalf of individuals of minority backgrounds. She petitions for review of an order of the Board of Immigration Appeals denying her application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture. The Board denied her application after upholding the immigration judge's adverse credibility finding based on, among other things, her misrepresentations about the dates when she was persecuted and subsequently entered the United States, as set forth in both her asylum application and an

interview with an immigration officer. Because substantial evidence supports this adverse credibility finding, we deny the petition for review.

**Background**

At a hearing before an IJ and in a written statement, Ruptash, now 39, offered the following account of her experiences growing up in Ukraine. She was born in Ukraine but her mother was a Russian national. She claims to have been the victim of persecution motivated by widespread prejudice in Ukraine against Russians—a prejudice that stems from bitterness about Russia's longstanding influence and control over the country. *See* Minorities at Risk Project, *Assessment for Russians in Ukraine* (December 31, 2003), http://www.refworld.org/docid/469f3ae01a.html; European Commission Against Racism and Intolerance, *Report on Ukraine*, 8 (February 21, 2012), *available at* http://www.coe.int/t/ dghl/monitoring/ecri/Country-by-country/Ukraine/UKR-CbC-IV-2012-006-ENG.pdf.

Specifically, she describes being bullied during childhood because she was identifiably Russian (Russian is her first language and when she speaks Ukrainian she does so with an accent), and says that she could not find work until her father paid to have the nationality listed on her birth certificate changed from Russian to Ukrainian. On one occasion in 1991, she was slapped by a police officer and called a "Moskali" (a derogatory Ukrainian term for Russians, *see* Serge Schmemann, *Birth Pangs of a Nation–A Special Report.; Ukraine Facing the High Costs of Democracy*, N.Y. Times, Nov. 6, 1992, http://www.nytimes. com/1992/11/06/world /birth-pangs-nation-special-report-ukraine-facing-high-costs-democracy.html?pagewanted=all&src=pm).

But the purported incidents of violence that prompted Ruptash to flee to the United States did not begin until 1998, when she joined a local political organization called "Equal Rights," dedicated to promoting equality for ethnic Russians and other minorities in Ukraine. That year, police interrupted one of the organization's meetings at Ruptash's home and forced their way inside, whereupon they tore up her Ukrainian passport, butted her husband in the head with a rifle, and arrested her. Ruptash was held in a cramped, dirty cell for three days, interrogated, and beaten until she was badly bruised; she also suffered a broken nose. A few months later, Ruptash, who cut out from an Equal Rights demonstration that had just been disbanded by the police, returned home to find that police officers had strapped her husband—face bloodied—to a chair. The police threw her to the ground, kicked her repeatedly, and threatened to kill her if she continued working with Equal Rights. Ruptash suffered broken ribs, was hospitalized for a week, and convalesced in bed for an additional three weeks. She then decided to escape to the United States, traveling through Mexico and arriving in Los Angeles in 1999 (without

documentation) to join her husband who had arrived illegally a few months earlier; their son remained behind in Ukraine with Ruptash's mother-in-law.

Ruptash eventually applied for asylum and withholding in 2005—claiming persecution based on nationality, political opinion, and social group—but her application contained numerous misrepresentations, most notably that she had entered the United States in 2005 (not 1999) and that the beatings she allegedly endured occurred in 2004 (not 1998). Ruptash repeated these misrepresentations a few months later during an interview with an immigration officer. The officer asked if Ruptash understood the contents of her application and could ensure its accuracy; she assured him that the information in her application was all correct, and repeated the misrepresented dates. She did not admit to lying until confronted with proof that she had been issued a social security number in 2001 or 2002 and an Illinois driver's license in 2000. She then explained that she lied because an attorney had told her that any application for asylum filed more than a year after entry would be untimely. Following the interview Ruptash was served with a Notice to Appear charging her with removability under 8 U.S.C. § 1227(a)(1)(A), and her case was referred to an IJ; she has since conceded that she is removable as charged.

Months after her interview with the immigration officer, Ruptash wrote a letter to the IJ and tried to explain her misrepresentations. She claimed that a notary named Vardan had helped her prepare her application and, without her knowledge, changed the dates of her narrative. Though she discovered the changes before her interview, Ruptash did not reveal Vardan's role or admit the falsehoods because she believed that he might be connected to the Russian language interpreter present at the interview. At some point on the day of Ruptash's interview, Vardan had threatened to use his connections in Ukraine to hurt her if she disclosed his involvement in her application; whether this threat took place before or after the interview is unclear from the record.

The IJ ultimately denied Ruptash relief, concluding that Ruptash was "not credible" and her corroborating documents did not "independently support a grant of relief." The IJ found Ruptash's claim "not worthy of belief" because her misrepresentations about her dates of persecution and entry to the United States went "directly to the heart of her claim." The IJ characterized these falsehoods as an effort to "deliberately and repeatedly [mislead] the government and the court," and also concluded that Ruptash's attempt to explain those misrepresentations was "implausible" and "uncompelling." The IJ did not believe Ruptash's story about Vardan because Ruptash had admitted being fully aware of the one-year bar when she submitted her application, and persisted with her falsehoods until she had no other option. Moreover, the IJ believed Ruptash embellished her claim by waiting until her hearing to mention for the first time that police had broken her nose. Finally, the IJ discounted Ruptash's corroborating evidence because none of the documents referred to

the beatings she allegedly endured, and no testimony was presented from her husband, who purportedly witnessed her arrest and one of her beatings.

Ruptash appealed to the Board, which adopted the IJ's decision in a cursory order. When, as here, the Board adopts and supplements the IJ's decision, the IJ's decision as supplemented by the Board becomes the subject of the appeal. *See Jonaitiene v. Holder*, 660 F.3d 267, 270 (7th Cir. 2011).

## Analysis

In this petition, Ruptash challenges only the adverse credibility finding relied upon by the IJ (and the Board) to deny her application. She argues principally that her misrepresentations were not sufficiently material to doom her claim. *See Adekpe v. Gonzales*, 480 F.3d 525, 531 (7th Cir. 2007). She does not expound on this point, however, beyond noting that her misrepresentations do not relate to her narrative about the persecution she suffered in Ukraine.

This court will disturb an IJ's credibility assessment only in "extraordinary circumstances." *Rama v. Holder*, 607 F.3d 461, 465 (7th Cir. 2010); *Krishnapillai v. Holder*, 563 F.3d 606, 617 (7th Cir. 2009). The IJ here appropriately relied on Ruptash's repeated misrepresentations about her dates of persecution and entry to ground her adverse credibility finding, because these misrepresentations were material rather than trivial. *See Krishnapillai*, 563 F.3d at 617; *Kadia v. Gonzales*, 501 F.3d 817, 822 (7th Cir. 2007). These falsehoods bore directly on Ruptash's ability to establish eligibility for asylum, *see* 8 U.S.C. § 1158(a)(2)(B); *Patel v. Holder*, 581 F.3d 631, 634 (7th Cir. 2009). Because Ruptash was willing to deliberately lie to avoid the consequences of her untimely filing and remain in the United States, it was within the IJ's discretion to conclude that she would also have been willing to fabricate her account of mistreatment at the hands of the Ukrainian police. *See Pavlov v. Holder*, 697 F.3d 616, 617, 619 (7th Cir. 2012); *Alsagladi v. Gonzales*, 450 F.3d 700, 701 (7th Cir. 2006). Given that even a single, significant falsehood can ground an adverse credibility finding, *see Long-Gang Lin v. Holder*, 630 F.3d 536, 544 (7th Cir. 2010); *Huang*, 453 F.3d at 945, 947, the IJ did not err by disbelieving Ruptash's account of persecution.

Because the IJ appropriately disbelieved Ruptash's account, she was required to present a "convincing explanation" for the falsehoods in her asylum application. *See Torres v. Mukasey*, 551 F.3d 616, 626 (7th Cir. 2008); *Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004). Ruptash contends that she did just that by explaining that Vardan supplied the false dates and threatened to harm her if she did not go along with the lies. Though the IJ could not have discredited Ruptash if she were an unknowing or unwilling participant in Vardan's fraud, *see Chen v. Gonzales*, 420 F.3d 707, 710 (7th Cir. 2005) (citing *Alvarez- Santos*

*v. INS*, 332 F.3d 1245, 1254 (9th Cir. 2003)), the record did not compel the IJ to accept such a conclusion. As the IJ noted, Ruptash admitted that she was aware, long before submitting her application, that it would be untimely, and repeated her lies until confronted by the immigration officer with proof that she had years earlier obtained a driver's license and social security number. Thus, the IJ could reasonably conclude that Ruptash's story about Vardan was simply her attempt to fabricate an excuse to escape the consequences of her earlier falsehoods. *See Pavlov*, 697 F.3d at 619.

Ruptash also generally asserts that the IJ erred by not explicitly discussing her demeanor or the inherent plausibility of her account—two of the factors upon which an IJ "may base" a credibility finding. *See* 8 U.S.C. § 1158(b)(1)(B)(iii). But, having spotlighted the significance of Ruptash's misrepresentations, the IJ was not required to specifically comment on every other factor listed in 8 U.S.C. § 1158(b)(1)(B)(iii). *See Boadi v. Holder*, 706 F.3d 854, 860 (7th Cir. 2013); *Mitondo v. Mukasey*, 523 F.3d 784, 789 (7th Cir. 2008).

Ruptash last contends that her failure to provide testimony or an affidavit from her husband should not have been "held against her" by the IJ, because the IJ never requested such corroboration before issuing a decision. But the IJ could reasonably have expected corroborating testimony from Ruptash's husband: he could provide a firsthand account of Ruptash's beatings, which are nowhere mentioned in the corroborating documents Ruptash did submit. *See Krishnapillai*, 563 F.3d at 619 (corroboration could reasonably be expected from applicant's wife who had witnessed many of the otherwise uncorroborated events described in asylum application). Moreover, the REAL ID Act informs applicants that an IJ may require corroboration even if they testify credibly. *See* 8 U.S.C. § 1158(b)(1)(B)(ii). Because the REAL ID ACT itself put Ruptash on notice that she should provide all the corroborating evidence available, the IJ was not *required* to independently ask her for her husband's affidavit, or give her a second chance to supply that evidence before ruling against her. *See Abraham v. Holder*, 647 F.3d 626, 633 (7th Cir. 2011); *Rapheal v. Mukasey*, 533 F.3d 521, 530 (7th Cir. 2008).

Accordingly, we **DENY** Ruptash's petition for review.